TENTATIVE RULING

ISSUED BY JUDGE J. BARRETT MARUM

| | |
|---|---|
| Case Name: | In re The Phair Company LLC |
| Case Number: | 25-00667-JBM11 |
| Hearing: | 8/5/2026 2:00 PM |
| Motion: | (1) MOTION TO DISMISS OR CONVERT CASE TO CHAPTER 7 PURSUANT TO 11 U.S.C. § 1112(b) OR, IN THE ALTERNATIVE, TO APPOINT CHAPTER 11 TRUSTEE UNDER 11 U.S.C. § 1104(a) FILED ON BEHALF OF U.S. TRUSTEE; (2) MOTION TO EXTEND EXCLUSIVITY PERIOD FOR DEBTOR TO SOLICIT AND OBTAIN ACCEPTANCES OF A CHAPTER 11 PLAN OF REORGANIZATIONN FILED ON BEHALF OF THE PHAIR COMPANY LLC |

1-2) The Court has reviewed the United States Trustee's (the "UST's") Motion to Dismiss or Convert Case to Chapter 7 Pursuant to Section 1112(b) or, in the Alternative, to Appoint Chapter 11 Trustee Uder Section 1104(a) (ECF No. 412),  Renzulli's Joinder to the UST's Motion to Convert (ECF No. 464), the Debtor's Opposition (ECF No. 471), Affordable Housing Land Consultants LLC's ("AHLC's") and Century Housing Corporation's Joinder (ECF No. 476), the Debtor's Periodic Reports (ECF Nos. 492 – 494 and 498 - 503), the Debtors' Motion to Strike and Protective Opposition to Renzulli's Joinder (ECF No. 472), the Debtors' Joint Supplemental Opposition to Joinder of Renzulli Properties LLC and Thomas Renzulli to the United States Trustee's Motion to Dismiss or Convert Case (ECF No. 495), and the Debtors' Joint Opposition to AHLC's and Century Housing Corporation's Joinder to the United States Trustee's Motion to Dismiss (ECF No. 496).  The Court also reviewed AHLC's and Renzulli's Replies.  ECF Nos. 504 and 506.  It appears to the Court that cause to either convert or dismiss under 11 U.S.C. § 1112(b)(4) exists because the Estate has and is suffering a substantial and continuing loss to or diminution thereof and there is an absence of a reasonable likelihood of rehabilitation.  Cause to dismiss or convert also appears to exist due to gross mismanagement.  The Court remains unconvinced that the Debtors filed these cases in bad faith.

## Cause to Dismiss or Convert Appears to Exist

The movant bears the initial burden of proving cause to dismiss or convert exists by a preponderance of the evidence. *In re Premier Golf Props., LP*, 564 B.R. 710, 722 (Bankr. S.D. Cal.

2016) ("the movant bears the burden of establishing by a preponderance of the evidence that cause exists. *Id.* 'Once the movant establishes cause to convert or dismiss the case, the burden shifts to the party opposing the motion, usually the debtor, to establish grounds for applying the exception under § 1112(b)(2) and avoid conversion or dismissal.'").

Specifically, cause likely exists under 11 U.S.C. § 1112(b)(4)(A) in that the Estate has suffered a substantial or continuing loss. "If the loss is sufficiently large given the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate an[d] interest of creditors, the loss is substantial." *In re M.A.R. Designs & Constr., Inc.*, 653 B.R. 843, 855 (Bankr. S.D. Tex 2023). When the Debtors failed to meet the deadlines the Court set with their input to sell the Bella Mar project, Renzulli enforced its lien against the property located at 945 E. J Street (the "J Street Property"). That sale generated a mere $50,000 despite the Debtors' valuing the vacant land at $2,700,000 in its Schedules and then also later claiming that "the Phair Company, LLC will be able to sell the 945 E. J Street Project for $5 million, resulting in a profit of $1 million to $3 million[.]" ECF No. 10 at 8; ECF No. 34-2 at 2. If the Debtors' valuation of the J Street Property was even remotely accurate, Renzulli's sale of it resulted in a substantial loss to the estate, especially in light of the fact that the sale only reduced the Renzulli debt by $50,000. In addition and as discussed below, the Debtors have abandoned numerous limited liability companies throughout the course of this case, which further supports the conclusion that the Estate is suffering losses.

Likewise, the Debtors appear to have grossly mismanaged the Estate by abandoning projects, failing to actualize progress on projects, and painting an inaccurate picture with respect to their finances. "Gross mismanagement focuses solely on post-petition conduct" in the context of evaluating cause under 11 U.S.C. § 1112(b)(4)(B), so the Court examines the Debtors' post-petition conduct to assess whether conversion or dismissal is appropriate. *In re M.A.R. Designs & Constr., Inc.*, 653 B.R. at 859. Indeed, "numerous inaccuracies in [a] Debtor's MORs" and thus also in periodic reports "can demonstrate gross mismanagement when paired [with] misconduct that leaves the Court and all parties in interest with an *inaccurate picture of Debtor's financial condition*." *Id.* (italics added). Here, the Debtors' financial picture is muddied, in large part because the Debtors' valuations of its various projects have been a moving target, operating reports and periodic reports have been late filed or not filed until the Debtors have been prodded. and the Debtors have abandoned numerous projects. Taking all of this together, it seems the Debtors have grossly mismanaged the Estate.

Thus, it seems clear to the Court that the UST effectively met its initial burden to show cause by a preponderance of the evidence. There also does not seem to be any realistic possibility the Debtors will be able to confirm a plan. There does not appear to be any cash available to pay administrative claims on the Effective Date and the mere fact that the plan contemplates payments over time with respect to those claims does not mean that the impacted professionals will agree to accept such treatment. Even leaving that issue aside, the Court has serious concerns regarding all of the following:

- If, as the Debtors claim, the success of the Debtors' cases hinge on their "valuable experience and historical knowledge," why have the Debtors abandoned so many projects and/or entities?  Although the individual Debtor listed the majority of these entities as having an "unknown" value in his Schedules, he clearly contemplated that at least some of them would have significant value in the future.  Case No. 25-00661-JBM11, ECF No. 12.  Yet that now no longer seems to be the case: (Sunridge View Investors LLC: ECF No. 494 at 10 ("the project was abandoned.  The LLC is no longer in business."); Dorado Apartments Investors LLC: ECF No. 436 at 10 ("There is no shareholder equity.  The project was abandoned and the LLC is no longer in business."); Flynn Estates Investors LLC ECF No. 437 at 10 ("There is no equity.  The project was abandoned.  The LLC is no longer in business."); KAJUL-10 Properties LLC: ECF No. 438 at 10 ("There is zero equity.  The property was foreclosed upon.  The LLC was abandoned and is no longer in business."); RTA Phair Hollister LLC: ECF No. 492 at 5 ("This LLC was formed to build out the Bella Mar project, in the future, as 380 apartments.  The Bella Mar land is awaiting final approvals from the city of San Diego.  The principals of RTA Phair Hollister LLC have decided to not build the apartments.  To date, RTA Phair Hollister has not conducted any business, has no assets, and has not had any revenue or expenses.").

- What impact does the Debtors' history of repeatedly abandoning projects have on the factors favoring dismissal or conversion when funding the plan hinges on the real estate development projects?  ECF No. 496 at 10.  Specifically, does the Debtors' having abandoned projects previously support the conclusion that the Debtors are unlikely to be able to confirm a plan?

- What is the current status of negotiations with Lennar regarding the purchase price of the Bella Mar property?  ECF No. 472 at 4.  The Court has significant concerns about the progress of this sale, which seems to be essentially where it was roughly a year ago when the Court was ruling on the stay relief motion related to the J Street Property.  ECF No. 363 at 3 (filed April 7, 2026) ("Mr. Phair, through BMLI, accepted an offer, in the form of a letter of intent, to sell the Bella Mar Property to Lennar, one of the largest home builders in the United States for $19.5 million.  The purchase contract being drafted between Lennar and the Bella Mar Property sellers will be over 100 pages and will not be completed until mid October.").  (The Court previously provided a deadline for the sale of this property of December 5, 2025; when the Debtor failed to meet this long passed deadline, the automatic stay lifted with respect to the J Street Property referenced above.  ECF No. 119.)

- How do the Debtors explain the changing valuations for entities and projects throughout the case?  How can the Court or creditors have any confidence in the Debtors' plan to develop and sell projects when the Debtors have missed so badly in valuing so many of their projects?

- Excluding the abandoned entities, three projects appear to persist in this case. The first, the Scripps Ranch Project, is the subject of significant state court litigation with Renzulli. It also has ownership issues as reflected in the Examiner's Report (ECF No. 362 at 12), so it is not at all clear what value, if any, could arise from the sale of this property. Moreover, the Debtor's valuation of this property is not consistent, where on March 28, 2025, he valued the project at $34 million (ECF No. 17 at 3), and just a month later on April 30, 2025, he valued it at $50 million (ECF No. 47 at 12). Then on June 25, 2026, the alleged value shot up to $56 million (ECF No. 471-1 at 3), undermining the Debtor's credibility respecting his expertise and the valuations themselves. The second, the Bella Mar Project, has demonstrated little progress towards sale despite promises thereof for nearly a year, as discussed in further detail above. The Bella Mar Project also has been the subject of varying (and declining) valuation, where the Debtor valued the relevant LLC at $11,250,000 on March 4, 2025, and then $5,608,500 in May 2026 (ECF No. 435). Finally, the PREAFF III Project may have a value between $4.4 million (ECF No. 471-1 at 4) and $5 million (ECF No. 439), again according to conflicting reports, but that amount would hardly cover Renzulli's arbitration award, let alone the other claims in the case. Moreover, the Examiner valued this project at $800,000, which the Court considers as well. With only these three projects remaining, the Court fails to see a reliable source of funding for the plan.

**Good Faith Filing**

The Court also addresses AHLC's claims in its joinder and reply that the Debtors filed the chapter 11 petitions in bad faith. To counter this argument, the Debtors rely on the Court's earlier conclusion that "It is possible that the Debtors filed their chapter 11 cases primarily to stop Renzulli's efforts to exercise on its judgment[1] but that in and of itself is insufficient to establish bad faith in the Debtors filing their chapter 11 petitions." ECF No. 496 at 3 citing ECF No. 211 at 8. However, since then the Court has reviewed much new information, including the Examiner's Report and Supplemental Report (ECF Nos. 282 and 362) so revisiting this question is appropriate.

As a threshold matter, a "'debtor bears the burden of proving that the petition was filed in good faith.'" *In re Marshall*, 721 F.3d 1032, 1048 (9th Cir. 2013) (citing *Leavitt v. Soto* (*In re Leavitt*), 209 B.R. 935, 940 (9th Cir. BAP 1997) and *In re Powers,* 135 B.R. 980, 997 (Bankr. C.D. Cal. 1991)).

Although not enumerated under 11 U.S.C. § 1112(b)(4), "courts have overwhelmingly held that a lack of good faith in filing a Chapter 11 petition establishes cause for dismissal." *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994). Courts examine an "amalgam of factors" in determining whether a chapter 11 petition was filed in good faith and "[t]he test is whether a debtor is attempting to unreasonably deter and harass creditors or attempting to effect a speedy, efficient reorganization

---

[1] Case No. 37-2022-00046736-CU-BC-CTL, Dkt. Nos. 147 and 149.

on a feasible basis." *Id.*  Courts consider whether "cases seek to achieve objectives outside the legitimate scope of the bankruptcy laws" and whether debtors file cases for "tactical reasons unrelated to reorganization." *Id.*

The Court cannot ignore the timing of the Debtors' filings,[2] their impact on the state court action, and the questionable nature of the Debtors' valuing their assets.  Even all that, however, does not mandate a conclusion that the Debtors filed their cases in bad faith.  In this regard, the Court finds *In re St. Paul Self Storage Ltd. P'ship*, 185 B.R. 580 (9th Cir. BAP 1995) instructive. In that case, a creditor obtained a partial judgment against the debtor.  *In re St. Paul Self Storage Ltd. P'ship*, 185 B.R. at 582.  However, the debtor in *St. Paul* filed for bankruptcy as part of a litigation tactic, where the debtor's case "was an improper attempt to gain a more convenient forum for its litigation against Appellee." *Id.* at 583.  Specifically, "[t]he timing of the petition and the unsuccessful progress of the [state court] litigation strongly suggests Debtor's intent to use the bankruptcy code as a means to escape to a forum which it perceived to be more friendly." *Id.* Notably, rather than liquidate its claims against the creditor at a scheduled state court trial, the debtor in *St. Paul* filed a turnover complaint in the bankruptcy court that included the exact same state court claims for relief. *Id.* at 582.  Here, the Debtors do not seek to re-litigate the state court case against Renzulli—indeed, the Debtors include Renzulli's judgment that resulted from arbitration in the initial plan.  ECF No. 304 at 17, 19.  Unlike the debtor in *St. Paul*, the Debtors here defend litigation initiated by creditors in these cases.  *See* Case Nos. 25-90068-JBM and 25-90115-JBM.

Moreover, timing alone cannot support a conclusion the petitions were not filed in good faith.  The Debtors specifically including Renzulli's judgment in the initial joint plan makes it more "likely that they filed their petition in order to 'effect a speedy, efficient reorganization,' and not 'to unreasonably deter and harass creditors.'" *In re Marshall*, 721 F.3d at 1048 (citing *In re Marsch*, 36 F.3d at 828).  In *Marshall*, where the debtors included the judgment "in their initial Plan" such inclusion "suggest[ed] that they filed their bankruptcy petition for the proper purpose of reorganization, not as a mere ploy to avoid posting the bond" pending appeal, which could have amounted to a litigation tactic. *Id.*  The creditors here do not identify an ultimate goal or litigation tactic by the Debtors other than "stall[ing] the Superior Court action," which further undermines arguments regarding bad faith.  ECF No. 504 at 13.  This begs the question, what litigation goal do the Debtors pursue through these bankruptcy filings?  The Debtors do not avoid posting a bond by way of the filing as in many of the seminal cases regarding bad faith filings in the chapter 11 context. *See e.g.*, *In re Marsch*, 36 F.3d 825, *In re Boynton,* 184 B.R. 580, 581 (Bankr. S.D. Cal. 1995).  Here, the Debtors' joint plan proposes to:

---

[2] Renzulli obtained the judgment for $3,489,438.60 on March 22, 2024, and the Debtors filed for bankruptcy on February 25, 2025.  POC 1-1 at 6.  The filings less than a year after the creditor obtained the substantial judgment against both Debtors point to attempts to obstruct collection efforts.

> process the development entitlements for Phair's real estate development projects and use the proceeds from the sale of such projects to pay creditors. All payments required by the Plan will be made from proceeds from the sale of one or more of the Debtors' development projects and/or from distributions received by Mr. Phair as a result of his membership interests in the limited liability companies that he owns that hold title to such projects as set forth in the projections attached as Exhibit 3 and 4 to the Disclosure Statement.

ECF No. 304 at 17. While this treatment makes the Court question whether the Debtors present a reasonable likelihood of rehabilitation,[3] that goes to 11 U.S.C. § 1121(b)(4)(A), not whether the petitions were filed in good faith. Finally, the Debtors appear to be using these cases as a delay tactic; while these cases have not progressed as far as would be ideal, blame for that cannot be laid entirely at the Debtors' feet.

Given these conflicting factors and the high standard that "[g]ood faith is lacking only when the debtor's actions are a clear abuse of the bankruptcy process," the Court will not today conclude that the Debtors filed in a lack of good faith. *In re Arnold*, 806 F.2d 937, 939 (9th Cir. 1986).

**Dismissal Versus Conversion**

The Court is inclined to convert the cases because the Court concludes conversion, rather than dismissal, would be in the best interests of creditors. Here, the orderly collection and liquidation of assets would best serve the various creditors in this case rather than forcing them back into multiple disjunctive forums. Although the Court has doubts with respect to the values of the Debtors' assets given the varying values in the tables below, along with the speculative nature of the development prospects for the raw land plots, it is clear the land the Debtors own has *some* value and that this is not merely a two-party dispute that could be resolved in state court. The Court acknowledges that the Examiner's Supplemental Report, cited below, could only identify limited clear value, but this appears to be exacerbated by the individual Debtor's inability to provide adequate records to the Examiner and so the Court cannot conclude based on the Supplemental Report that the value of the Debtors' assets is limited to $800,000, as AHLC suggests. ECF No. 504 at 4. Instead, creditors could benefit from conversion to a chapter 7 case where the Chapter 7 Trustee could liquidate the assets described in the following sources:

---

[3] A real estate developer's plan to develop a series of projects by obtaining entitlements for raw land, where it has repeatedly abandoned projects with no alternative means to recover, diminishes that likelihood in the Court's view. Moreover, as detailed above only three projects remain and they are all questionable, and most of the LLC's have no equity according to the Debtor, so it is not clear where distributions might arise from. On paper, the Debtor presents many valuations, entity titles, and locations for purported projects, but they repeatedly appear to amount to just that: assets in name only.

- o Individual Debtor's Schedules: Case No. 25-00661-JBM11, ECF No. 12: March 4, 2025

| | | |
|---|---|---|
| ▪ Phair Company LLC | ▪ 100% | ▪ Unknown |
| ▪ Green Phair Scripps Partners LLC | ▪ 50% | ▪ Unknown |
| ▪ Phair Real Estate Acquisition Fund III LLC | ▪ 100% | ▪ Unknown |
| ▪ Flynn Estates Investors LLC | ▪ 100% | ▪ Unknown |
| ▪ Sunridge View Investors LLC | ▪ 100% | ▪ Unknown |
| ▪ Dorado Apartment Investors LLC | ▪ 75% | ▪ Unknown |
| ▪ KAJUL-10 Partners LLC | ▪ 50% | ▪ Unknown |
| ▪ Bella Mar Land Investors LLC | ▪ 75% | ▪ $11,250,000 |
| ▪ RTA Phair/Hollister, LLC | ▪ 50% | ▪ Unknown |

- o Examiner's Supplemental Report: Case No. 25-00667-JBM11: ECF No. 362: April 2, 2026

| | |
|---|---|
| The Phair Company LLC | $0 |
| RTA Phair Hollister LLC | $0 |
| Green Phair Scripps Partners LLC | Unknown |
| Bella Mar Land Investors LLC | Unable to Determine |
| Dorado Apartments Investors LLC | $0 |
| Flynn Estates Investors LLC | $0 |
| KAJUL-10 Partner LLC | $0 |
| Phair Real Estate Acquisition Fund III | $800,000 |
| Sunridge View Investors LLC | $0 |

- o Corporate Debtor's Periodic Reports: Case No. 25-00667-JBM11: April 21, 2026 – May 29, 2026

| | | |
|---|---|---|
| The Phair Company LLC | ECF No. 430 | - $848,323 |
| RTA Phair Hollister LLC | ECF No. 431 and ECF No. 492 | $0 |
| Green Phair Scripps Partners LLC | ECF No. 432 and ECF No. 493 | $27,970,000 (1/2 of this) |
| Bella Mar Land Investors LLC | ECF No. 435 | $5,608,500 (values the land at $7,312,500—substantially lower than the $11,250,000 a year prior) |
| Dorado Apartments Investors LLC | ECF No. 436 | $0 |
| Flynn Estates Investors LLC | ECF No. 437 | $0 |
| KAJUL-10 Partner LLC | ECF No. 438 | $0 |
| Phair Real Estate Acquisition Fund III | ECF No. 439 | $5,000,000 |
| Sunridge View Investors LLC | ECF No. 440 | $0 |

The Court also includes the tables above to illustrate the vacillating nature of the entity values and thus the Court's doubts with respect to their credibility.  In addition, the majority of creditors who have taken a position on the issue support conversion.  Thus, if the Court concludes, as seems likely, that cause exists to dismiss or convert the case, it will likely convert the case.

**Motion to Extend Exclusivity**

This Motion will rise and fall depending on the outcome the Court reaches on the pending motion to dismiss or convert the case the UST filed.  ECF No. 412.  If the Court dismisses or converts the case, the Court will deny this Motion as moot.  If the Court denies the motion to dismiss, however, the Court anticipates it will grant this Motion and extend the second exclusivity period to allow the Debtors to solicit ballots with respect to the Joint Plan (ECF No. 304) they filed.